1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   BERNARDOS GRAY, JR.,                    No.  2:12-cv-3006 KJM AC P

12              Plaintiff,

13        v.                                 ORDER TO SHOW CAUSE AND
                                             FINDINGS & RECOMMENDATIONS
14   T. VIRGA, et al.,

15              Defendants.

16

17        Plaintiff is a prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. §

18   1983.  Currently before the court is defendants' fully briefed motion for summary judgment.  ECF

19   No. 100.

20        I.      Procedural History

21        On December 9, 2012,[1] plaintiff filed a complaint in which he alleged that defendants

22   Virga, Nielson, Starnes, and Gam failed to protect him and that defendants Phelps and

23   Wangombe were deliberately indifferent to his serious medical needs.  ECF No. 1.  Defendants

24   moved for dismissal on the ground that plaintiff did not exhaust his administrative remedies.

25   ECF Nos. 14, 17.  The motion to dismiss was denied as to defendants Virga, Nielson, Starnes,

26

27   _____
     [1]  Since plaintiff is a prisoner proceeding pro se, he is afforded the benefit of the prison mailbox
     rule.  See Houston v. Lack, 487 U.S. 266, 276 (1988).
28

                                          1

1    and Gam and granted as to defendants Phelps and Wangombe.[2]  ECF Nos. 36, 40.

2           Defendants Virga, Nielson, Starnes, and Gam proceeded to answer the complaint and,

3    after the close of discovery, filed a motion for summary judgment.  ECF No. 64.  As a result of

4    unresolved discovery issues and subsequent complications related to plaintiff's release from state

5    custody, the motion for summary judgment was vacated with a new filing deadline to be

6    established once plaintiff's status and property issues were resolved.  ECF Nos. 89, 95.  After the

7    deadline for filing a summary-judgment motion was re-set (ECF No. 99), defendants filed the

8    instant motion (ECF No. 100), which plaintiff opposes (ECF No. 111).

9           II.      Plaintiff's Allegations

10           Plaintiff alleges that defendants Virga, Nielson, Gam, and Starnes violated his Eighth

11   Amendment rights when they moved another inmate into his cell without taking proper safety

12   precautions and that upon placement in the cell the inmate immediately assaulted him.  ECF No.

13   1 at 3-5.  Specifically, he claims that defendant Nielson approved inmate Williams to house with

14   plaintiff despite knowing that Williams was "deemed a[n] 'obvious' danger to others in the

15   general population."  Id. at 4.  Defendant Virga failed to properly train defendants Gam and

16   Starnes in the mandatory requirements and procedures for cell searches in high risk security units.

17   Id. at 3.  Plaintiff also appears to allege that Virga implemented deficient double-cell policies in

18   those same units.  Id. at 8.  As a result of the deficient training, Gam and Starnes did not conduct

19   a mandatory search before placing inmate Williams in the cell with him, allowing Williams to

20   assault plaintiff with a weapon almost immediately after being placed in the cell.  Id. at 3.  Once

21

22   _____

     [2]  The motion to dismiss based on plaintiff's failure to exhaust was resolved prior to the Ninth
23   Circuit's decision in Albino v. Baca, which requires that questions of administrative exhaustion
     be decided pursuant to motions for summary judgment.  747 F.3d 1162, 1166 (9th Cir. 2014).  In
24   this case, a copy of the appeal response relied on by the court in granting the motion as to
     defendants Phelps and Wangombe was attached to the complaint.  ECF No. 1 at 23-24; ECF No.
25   36 at 18-19.  Since the court may properly consider documents attached to the complaint, United
     States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) (citations omitted), plaintiff's "failure to
26   exhaust [was] clear from the face of the complaint and the result would not be altered by
     discovery," McBride v. Lopez, 807 F.3d 982, 985 (9th Cir. 2015) (citing Albino, 747 F.3d at
27   1169).  Because there was "no need for further factual development," Albino does not affect the
     decision in this case.  McBride, 807 F.3d at 985.

28

1    the assault began, Gam and Starnes deliberately sprayed plaintiff with pepper spray, rather than

2    his assailant, and did not take any further action until the assault was over.  Id. 4-5.

3        III.    Motion for Summary Judgment

4            A.  Defendants' Motion

5            Defendants move for summary judgment on the grounds that defendant Virga did not

6    personally participate in the alleged violations, that defendants were not deliberately indifferent

7    because they were not aware of a substantial risk of harm to plaintiff, that they were not required

8    to conduct searches as plaintiff alleges, that they responded appropriately to the assault, and that

9    they are alternatively entitled to qualified immunity.  ECF No. 100-1 at 8-14.  They also argue

10   that plaintiff's request for injunctive relief against defendant Virga is moot and should be

11   dismissed.  Id. at 14.

12           B.  Plaintiff's Response

13           It is well-established that the pleadings of pro se litigants are held to "less stringent

14   standards than formal pleadings drafted by lawyers."  Haines v. Kerner, 404 U.S. 519, 520 (1972)

15   (per curiam).  Nevertheless, "[p]ro se litigants must follow the same rules of procedure that

16   govern other litigants."  King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987), overruled on other

17   grounds, Lacey v. Maricopa Cnty., 693 F.3d 896 (9th Cir. 2012) (en banc).  However, the

18   unrepresented prisoners' choice to proceed without counsel "is less than voluntary" and they are

19   subject to "the handicaps . . . detention necessarily imposes upon a litigant," such as "limited

20   access to legal materials" as well as "sources of proof."  Jacobsen v. Filler, 790 F.2d 1362,

21   1364-65 & n.4 (9th Cir. 1986).  Inmate litigants, therefore, should not be held to a standard of

22   "strict literalness" with respect to the requirements of the summary judgment rule.  Id.

23           The court is mindful of the Ninth Circuit's more overarching caution in this context, as

24   noted above, that district courts are to "construe liberally motion papers and pleadings filed by

25   pro se inmates and should avoid applying summary judgment rules strictly."  Thomas v. Ponder,

26   611 F.3d 1144, 1150 (9th Cir. 2010).  Accordingly, though plaintiff has largely complied with the

27   rules of procedure, the court will consider the record before it in its entirety.  However, only those

28   assertions in the opposition which have evidentiary support in the record will be considered.

In his opposition, plaintiff argues that defendants are not entitled to summary judgment because there are material issues of fact as to the required search procedures.  ECF No. 111 at 3-4.  Plaintiff further argues that the fact that defendants Gam, Starnes, and Nielson stated there was no policy requiring them to search Williams proves that defendant Virga was "grossly negligent in managing subordinates."  Id. at 7-8.  He contends that defendant Virga is not entitled to summary judgment because Virga knew that Williams had attacked another inmate who was in the same gang as plaintiff, but failed to order his subordinates to keep the two gangs separated.  Id. at 6.  As to all defendants, plaintiff argues that they are not entitled to summary judgment because they all knew that Williams was a threat to his safety.  Id. at 10-35.

C.  Legal Standards for Summary Judgment

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact."  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element

4

1  of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.  In such

2  a circumstance, summary judgment should "be granted so long as whatever is before the district

3  court demonstrates that the standard for the entry of summary judgment, as set forth in Rule

4  56(c), is satisfied." Id.

5         If the moving party meets its initial responsibility, the burden then shifts to the opposing

6  party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec.

7  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  In attempting to establish the

8  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

9  of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

10  admissible discovery material, in support of its contention that the dispute exists. See Fed. R.

11  Civ. P. 56(c).  The opposing party must demonstrate that the fact in contention is material, i.e., a

12  fact "that might affect the outcome of the suit under the governing law," Anderson v. Liberty

13  Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,

14  809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., "the evidence is such that a

15  reasonable jury could return a verdict for the nonmoving party," Anderson, 447 U.S. at 248.

16         In the endeavor to establish the existence of a factual dispute, the opposing party need not

17  establish a material issue of fact conclusively in its favor.  It is sufficient that "'the claimed

18  factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the

19  truth at trial.'" T.W. Elec. Serv., 809 F.2d at 630 (quoting First Nat'l Bank of Ariz. v. Cities

20  Serv. Co., 391 U.S. 253, 288-89 (1968).  Thus, the "purpose of summary judgment is to pierce the

21  pleadings and to assess the proof in order to see whether there is a genuine need for trial."

22  Matsushita, 475 U.S. at 587 (citation and internal quotation marks omitted).

23         "In evaluating the evidence to determine whether there is a genuine issue of fact, [the

24  court] draw[s] all inferences supported by the evidence in favor of the non-moving party." Walls

25  v. Central Costa Cnty. Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted).  It is

26  the opposing party's obligation to produce a factual predicate from which the inference may be

27  drawn. See Richards v. Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

28  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

5

1    some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586 (citations

2    omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the

3    non-moving party, there is no 'genuine issue for trial.'"  Id. at 587 (quoting First Nat'l Bank, 391

4    U.S. at 289).

5        On February 22, 2016, defendants served plaintiff with notice of the requirements for

6    opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  ECF No. 105.

7    See Klingele v. Eikenberry, 849 F.2d 409, 411 (9th Cir. 1988); Rand v. Rowland, 154 F.3d 952,

8    960 (9th Cir. 1998) (movant may provide notice) (en banc).

9        D.  Legal Standards Governing Eighth Amendment

10       "The Constitution does not mandate comfortable prisons, but neither does it permit

11    inhumane ones."  Farmer v. Brennan, 511 U.S. 825, 832 (1994) (internal quotation marks and

12    citation omitted).  "[A] prison official violates the Eighth Amendment only when two

13    requirements are met.  First, the deprivation alleged must be, objectively, sufficiently serious, a

14    prison official's act or omission must result in the denial of the minimal civilized measure of

15    life's necessities."  Id. at 834 (internal quotation marks and citations omitted).  Second, the prison

16    official must subjectively have a sufficiently culpable state of mind, "one of deliberate

17    indifference to inmate health or safety."  Id. (internal quotation marks and citations omitted).  The

18    official is not liable under the Eighth Amendment unless he "knows of and disregards an

19    excessive risk to inmate health or safety; the official must both be aware of facts from which the

20    inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

21    inference."  Id. at 837.  Then he must fail to take reasonable measures to abate the substantial risk

22    of serious harm.  Id. at 847.  Mere negligent failure to protect an inmate from harm is not

23    actionable under § 1983.  Id. at 835.  A person can deprive another of a constitutional right,

24    within the meaning of § 1983, "not only by some kind of direct personal participation in the

25    deprivation, but also by setting in motion a series of acts by others which the actor knows or

26    reasonably should know would cause others to inflict the constitutional injury."  Johnson v.

27    Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978).

28    ////

1    E. <u>Undisputed Material Facts</u>

2        At all times relevant to the complaint, plaintiff was an inmate housed at the California

3    State Prison-Sacramento (CSP-Sac).  Defendants' Statement of Undisputed Facts (DSUF) (ECF

4    No. 101) ¶ 1; Plaintiff's Response to DSUF (ECF No. 111-2) at ¶ 1.  At all times relevant to the

5    complaint, defendants were employed at CSP-Sac.  DSUF ¶¶ 2-4; Response to DSUF at ¶ 1.

6    Defendant Virga was the warden, defendant Nielson was a correctional lieutenant, and defendants

7    Gam and Starnes were correctional officers.  <u>Id.</u>

8        When an inmate housed in administrative segregation requests a cell move, the building's

9    lieutenant is supposed to review the central files of the requesting inmate and his potential new

10   cellmate before the move is approved.[3]  DSUF ¶ 7; Response to DSUF at ¶ 5.  After the lieutenant

11   determines that there are no safety concerns related to housing the two inmates together, the

12   inmates are asked to sign a compatibility chrono (CDCR form 1802-B), which provides the

13   inmates with an opportunity to refuse a cellmate or provide information as to why they do not

14   believe they can safely house with the new cellmate.  DSUF ¶ 8; Response to DSUF at ¶ 6.

15       On May 19, 2011, plaintiff and inmate Williams were initially housed in separate cells.

16   DSUF ¶ 9; Response to DSUF at ¶ 7; Reply in support of DSUF (ECF No. 113) ¶ 9.  Williams

17   advised defendant Gam that he was having problems with his cellmate and requested a cell

18   change that resulted in defendant Nielson approving Williams to house with plaintiff.  DSUF ¶¶

19   10, 14; Response to DSUF at ¶¶ 8, 10.[4]  Prior to defendant Nielson's approval of the housing

20   assignment, he reviewed the inmates' administrative segregation files, which indicate their gang

---

21   [3]  Defendant Nielson's declaration, which defendants rely on to support DSUF ¶¶ 7 and 8,
22   establishes only how defendant Nielson's carried out his duties related to inmate cell moves; it
     does not establish the standard procedure.  ECF No. 104 at ¶ 2.  The declaration also states that
23   Nielson reviewed inmate "administrative segregation files," not "central files" as indicated in
     DSUF ¶¶ 7 and 8.  However, the DOM provided by plaintiff, and plaintiff's responses to DSUF
24   ¶¶ 7 and 8, confirm the process outlined in DSUF ¶¶ 7 and 8.  ECF No. 111-1 at 247 (DOM §
     54046.7.1, effective April 13, 2009); Response to DSUF at ¶¶ 5, 6.  Plaintiff's argument that the
25   procedure was not properly carried out in his case (Response to DSUF at ¶ 6) does not create a
26   dispute as to what the process was supposed to entail.  DSUF ¶¶ 7 and 8 are therefore deemed
     undisputed.
27   [4]  Plaintiff disputes various portions of DSUF ¶¶ 10 and 14.  However, because the portions
     identified here were not addressed, they are deemed undisputed.
28

affiliations and any known enemies.[5]  DSUF ¶ 14; Response to DSUF at ¶ 10.  Defendant Starnes facilitated the signing of a compatibility chrono, which was signed by both plaintiff and Williams.  DSUF ¶ 13; Response to DSUF at ¶ 9.  After the cell move was approved, defendant Gam escorted Williams to the cell where plaintiff was housed.[6]  DSUF ¶ 15; Response to DSUF at ¶ 11.  Other than a visual search, defendant Gam did not search Williams before placing him in the cell with plaintiff.  DSUF ¶ 16; Response to DSUF at ¶ 12.

Plaintiff and Williams were both placed in handcuffs before plaintiff's cell door was opened.  DSUF ¶ 17; Response to DSUF at ¶ 2.  After Williams was placed inside the cell, his handcuffs were removed first.  DSUF ¶ 19; Response to DSUF at ¶ 14.  While defendant Gam was attempting to remove plaintiff's handcuffs, Williams began assaulting plaintiff.  DSUF ¶ 20; Response to DSUF at ¶ 15.  Gam sounded the alarm and utilized his pepper spray through the cell's food port.  ECF No. 1 at 4, ¶ 15; DSUF ¶ 21; Response to DSUF at ¶ 16.  Defendant Starnes arrived at the cell in response to the alarm and also discharged his pepper spray through the cell's food port.  DSUF ¶¶ 22, 23; Response to DSUF at ¶¶ 17, 18.  Before the cell door was opened, Williams threw a weapon out of the food port.[7]  DSUF ¶ 25.

At some point after defendant Starnes discharged his pepper spray, Williams stopped his assault of plaintiff.  DSUF ¶ 24; Response to DSUF at ¶ 19.  Williams was placed in handcuffs and plaintiff was ultimately escorted to the Treatment and Triage Area (TTA).  DSUF ¶¶ 26, 27,

---

[5]  Plaintiff argues that defendant Nielson did not follow policy because he did not review the complete central files and that he did not review the gang affiliation and enemy information.  Response to DSUF at ¶ 10; ECF No. 111 at 16.  Plaintiff's argument that Nielson did not review the central files does not create a dispute since Nielson has stated he only reviewed the administrative segregation files.  As for plaintiff's arguments regarding the gang affiliation and enemy information, the only evidence he offers to dispute this is his claim that Nielson would not have approved the cell assignment if he had checked them because there were clear safety concerns.  Plaintiff has no personal knowledge of what defendant Nielson reviewed and, as addressed in Section VII.A., the documentation does not establish the security issues plaintiff claims and therefore does not support an inference that Nielson did not review that information.  Plaintiff has not put forth any competent evidence that Nielson did not review the gang affiliation and enemy lists and this fact is therefore deemed undisputed.

[6]  Plaintiff disputes that Gam escorted Williams *directly* to his cell, but not that Gam conducted the escort.  Response to DSUF at ¶ 11.  This portion of DSUF ¶ 15 is therefore undisputed.

[7]  Plaintiff does not address this fact and it is therefore deemed undisputed.

29; Response to DSUF at ¶¶ 20, 22.  While plaintiff was being escorted, a weapon was found on him and he was charged with a rules violation.[8]  DSUF ¶ 28; Response to DSUF at ¶ 21.  Plaintiff is no longer in CDCR custody.  DSUF ¶ 31; ECF No. 97.

      F.   Discussion

          1.   Defendant Nielson

       Plaintiff alleges that defendant Nielson approved Williams being housed with plaintiff "[e]ven though inmate Williams is deemed a[n] 'obvious' danger to others in the general population."  ECF No. 1 at 4.  He also opines that nearly all of the factors to be considered when assigning cellmates demonstrated that he and Williams were not compatible, which Nielson would have known if he had reviewed both inmates' full central files.  ECF No. 111 at 12-16.  Plaintiff further argues that if Nielson had reviewed the complete central files, which he admitted he did not do, then he would have seen that Williams was in administrative segregation because he was deemed a danger to others and had recently assaulted another inmate who was in the same gang as plaintiff.  Id. at 11-18.

       Plaintiff argues that the following case factors show incompatibility between himself and Williams: (1) length of sentence (plaintiff was sentenced to fourteen years, while Williams had a life sentence); (2) victimization history (Williams had recently assaulted an inmate who was part of the same gang as plaintiff); (3) reasons for placement in administrative segregation (plaintiff was in administrative segregation for introducing petty contraband, Williams because he had been in possession of inmate manufactured weapons); (4) history of in-cell assault and/or violence (plaintiff had no history of violence while Williams did); and (5) the nature of their commitment offenses (plaintiff was convicted of robbery and Williams was convicted of murder).  Id. at 13-14.  However, plaintiff does not offer any evidence as to how the factors are to be weighed or why they demand a finding of incompatibility.  Nor does he establish that he is qualified to offer an opinion as to whether the factors show he and Williams were incompatible.  For example, while

---

[8]  Plaintiff disputes whether the weapon was his, but admits that it was found in his clothes. Response to DSUF at ¶ 21.  He does not address whether he received a rules violation and that fact is deemed admitted.

1   documents submitted by plaintiff do show that Williams had recently been charged with being in

2   possession of inmate manufactured weapons and fighting, the weapons charge shows that

3   Williams was double-celled at the time, without any indication of violence toward his cellmate.

4   ECF No. 111-1 at 135-36.  The fighting violation took place on the yard, not in Williams' cell,

5   and the fight was not with Williams' cellmate[9] nor was there any indication that the fight was

6   gang related.  Id. at 141-42.  Plaintiff offers no explanation why these rules violations would

7   demonstrate an inability to double-cell when it appears that Williams had previously been double-

8   celled without incident.

9        Plaintiff also argues that Nielson should have identified the incompatibility because the

10  previous week Williams had assaulted another inmate who was part of the same gang as plaintiff.

11  Id. at 12, 14.  Plaintiff contends this incident should have alerted Nielson to the fact that Williams

12  was a danger to anyone with the same gang affiliation as the inmate he assaulted, including

13  plaintiff.  Id. at 16-17.  However, the rules violation Williams received does not indicate that the

14  incident was gang related (ECF No. 111-1 at 141-45), and plaintiff offers no evidence to establish

15  that inmates who are affiliated with different gangs can never be housed together.  Additionally,

16  defendant Nielson did not approve the housing assignment until after he had received the signed

17  compatibility chrono, which stated that plaintiff and Williams agreed that they were compatible.

18  ECF No. 100-1 at 10; ECF No. 102-1 at 2; ECF No. 104, ¶ 3.  Though plaintiff argues that he was

19  threatened with disciplinary action if he did not sign the chrono (ECF No. 111 at 15-16), there is

20  no evidence that defendant Nielson had reason to believe plaintiff's consent to housing with

21  Williams was anything but voluntary.

22       Finally, plaintiff argues that policy specifies that double-cell assignments in administrative

23  segregation are to be determined based upon a review of the inmates' central or "C-files" (ECF

24  No. 111-1 at 247, Department Operations Manual (DOM) § 54046.7.1, effective April 23, 2009)

25  _____

26  [9]  Plaintiff has also submitted a declaration from another inmate stating that inmate Arnold, the inmate plaintiff alleges assisted Williams during the fight, was Williams' cellmate.  ECF No. 111-1 at 10.  Evidence that Williams' former cellmate was an accomplice rather than a victim does not support plaintiff's argument here.

27

28

1    and defendant Nielson has stated that he reviewed the inmates' "administrative segregation files"

2    (ECF No. 104 at ¶ 5).  Since defendants offer no explanation as to whether or how an inmate's

3    administrative segregation file differs from his central file, the court cannot find that Nielson

4    properly followed the procedures for approving a double-cell assignment.  However, while

5    "[f]ailure to follow prison procedures, which called for doing so before making a housing

6    decision, was certainly negligent; . . . negligence, or failure to avoid a significant risk that should

7    be perceived but wasn't, 'cannot be condemned as the infliction of punishment.'"  Estate of Ford

8    v. Ramirez-Palmer, 301 F.3d 1043, 1052 (9th Cir. 2002) (quoting Farmer, 511 U.S. at 838).  In

9    light of the signed compatibility chrono which stated that both inmates agreed to the housing

10   assignment, the court cannot find that Nielson's failure to review their complete central files was

11   anything more than negligent.

12         At a minimum, defendant Nielson reviewed plaintiff's and Williams' gang affiliations and

13   enemy lists, which plaintiff argues should have precluded them being housed together.  However,

14   plaintiff has not shown that the fact that he and Williams were in different gangs demonstrated

15   that housing him with Williams posed a substantial risk of serious harm to his safety.  Nor does

16   plaintiff establish that any of the other factors necessarily demonstrate incompatibility.  Even if

17   defendant Nielson failed to review the inmates' complete central files, that failure, in light of the

18   signed compatibility chrono, does not establish anything more than negligence, which is

19   insufficient to support a claim for deliberate indifference.  For these reasons, defendant Nielson is

20   entitled to summary judgment.

21              2.  Defendant Virga

22                   a.  Motion for Summary Judgment

23         In the complaint, plaintiff alleges that defendant Virga, as the Warden at CSP-Sac, failed

24   to adequately train defendants Gam and Starnes in the mandatory search procedures for high risk

25   security units.  ECF No. 1 at 3.  Plaintiff specifically alleges that policy required defendants Gam

26   and Starnes to search Williams, Williams' property, and plaintiff's cell before placing Williams in

27   plaintiff's cell, and that defendant Virga's failure to provide proper training on this policy resulted

28   in plaintiff's assault.  Id.  Under his claim for relief, plaintiff makes reference to policies related

11

1   to double-celling.  Id. at 8.  It appears that he was attempting to allege that Virga was responsible

2   for implementing deficient policies.  Id.

3        In the motion before the court, defendant Virga does not move for summary judgment on

4   either of these grounds and instead argues that he is entitled to summary judgment because he

5   was not personally involved in approving the cell assignment or escorting Williams to Gray's

6   cell.  ECF No. 100-1 at 8-9, 12.  The complaint does not make any claim that Virga was

7   personally involved in the cell move, and whether Virga was personally involved in the cell move

8   is irrelevant to the Eighth Amendment claims based on implementation of a deficient policy and a

9   failure to train.

10        "With limited exceptions . . . a district court may not grant summary judgment on a claim

11   when the party has not requested it."  Kelly v. Arriba Soft Corp., 336 F.3d 811, 822 (9th Cir.

12   2002).

13            A district court may grant a summary judgment motion "on grounds
             not raised by a party" only "[a]fter giving [the nonmovant] notice
14           and a reasonable time to respond."  Fed. R. Civ. P. 56(f)(2).  Only
             "if the moving party placed the nonmovant party on proper notice"
15           can the latter fairly "be held to have failed to satisfy its duty . . . to
             designate specific facts showing that there is a genuine issue for
16           trial."  Katz v. Children's Hosp. of Orange Cnty., 28 F.3d 1520,
             1534 (9th Cir. 1994).  "Reasonable notice implies adequate time to
17           develop the facts on which the litigant will depend to oppose
             summary judgment."  Norse v. City of Santa Cruz, 629 F.3d 966,
18           972 (9th Cir. 2010) (en banc).
19

20   Davis v. Patel, 506 F. App'x 677, 678 (9th Cir. 2013) (alteration in original).  Defendants'

21   "cursory mention that they were moving 'on all claims' did not suffice to alert [plaintiff], a pro se

22   litigant, that they sought summary judgment on [a specific] claim when they neither mentioned

23   that claim specifically nor presented any argument on it."  Wilkins v. County of Alameda, 571 F.

24   App'x 621, 624 (9th Cir. 2014).

25        Defendants have requested summary judgment on the ground that defendant Virga was

26   not personally involved in approving the cell assignment or escorting Williams to Gray's cell,

27   which plaintiff did not claim, and they have not moved for summary judgment on the claims that

28   plaintiff did make against Virga.  The motion for summary judgment will therefore be denied as

1    to defendant Virga, with one exception.  Plaintiff's claim for injunctive relief against Virga, in the

2    form of policy modification, is now moot.  Virga is therefore entitled to summary judgment on

3    that claim.

4          "An inmate's release from prison while his claims are pending generally will moot any

5    claims for injunctive relief relating to the prison's policies unless the suit has been certified as a

6    class action."  Dilley v. Gunn, 64 F.3d 1365, 1368 (9th Cir. 1995) (citations omitted).  A plaintiff

7    may proceed on a claim that is otherwise mooted if "(1) the challenged action is too short in

8    duration to be fully litigated prior to its expiration and (2) there is a reasonable expectation that

9    the injury will occur again."  Id. (citing Weinstein v. Bradford, 423 U.S. 147, 149 (1975)).

10   Plaintiff is no longer in CDCR custody and there is no "reasonable expectation that the injury will

11   occur again," so any claims he has for injunctive relief are moot.

12                      b.  Order to Show Cause

13         Although summary judgment on the claims against defendant Virga is not warranted for

14   the reasons already explained, 28 U.S.C. § 1915(e)(2)(B)(ii) provides that "[n]otwithstanding any

15   filing fee, or any portion thereof, that may have been paid, the court *shall* dismiss the case *at any*

16   *time* if the court determines that the action or appeal fails to state a claim on which relief may be

17   granted."  (Emphasis added).  If the Court finds that a complaint should be dismissed for failure

18   to state a claim, the Court has discretion to dismiss with or without leave to amend.  Lopez v.

19   Smith, 203 F.3d 1122, 1126-30 (9th Cir. 2000) (en banc).  Leave to amend should be granted if it

20   appears possible that the defects in the complaint could be corrected, especially if a plaintiff is pro

21   se.  Id. at 1130-31; see also Cato v. United States, 70 F.3d 1103, 1106 (9th Cir. 1995) ("A pro se

22   litigant must be given leave to amend his or her complaint, and some notice of its deficiencies,

23   unless it is absolutely clear that the deficiencies of the complaint could not be cured by

24   amendment.") (citing Noll v. Carlson, 809 F.2d 1446, 1448 (9th Cir. 1987)).  However, if, after

25   careful consideration, it is clear that a complaint cannot be cured by amendment, the court may

26   dismiss without leave to amend.  Cato, 70 F.3d at 1005-06.  "A district court may deny leave to

27   amend when amendment would be futile."  Hartmann v. CDCR, 707 F.3d 1114, 1130 (9th Cir.

28   2013).

13

1    In screening the complaint, the undersigned stated without elaboration that "[t]he

2    complaint states a cognizable claim for relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §

3    1915A(b)."  The court did not specify which allegations stated cognizable claims.  ECF No. 6 at

4    2.  The court now clarifies that the only allegations that stated a potentially cognizable claim

5    against defendant Virga were those regarding deficient training on mandatory search policies.

6    However, in opposing the motion for summary judgment, plaintiff has provided significantly

7    more information regarding the policies at issue.  Upon consideration of the expanded allegations,

8    plaintiff will be required to show cause why his claim for deficient training should not be

9    dismissed for failure to state a claim.  To the extent plaintiff may have been trying to make a

10   claim for an unconstitutional double-celling policy, the court will also address why that claim is

11   not cognizable, and plaintiff will be required to show cause why amendment would not be futile.

12                          i.  Failure to Train

13   With respect to the policies governing mandatory cell searches, any failure to train

14   appears to have no bearing on whether defendant was deliberately indifferent to plaintiff's safety

15   in this case, because Williams was moved into plaintiff's cell and not the other way around.  Even

16   if defendant Virga failed to provide training on cell searches, it does not appear plaintiff has

17   suffered harm or was at risk of harm due to a failure to search his cell.  Any potential harm would

18   have been to Williams.  As for the cell and property search policies, contrary to plaintiff's claim,

19   the policies he alleges defendants Gam and Starnes failed to follow do not require mandatory strip

20   searches or property searches every time an inmate is moved to a different cell within the ASU.

21   Instead, the policies require that an inmate in the ASU will be given an unclothed body search

22   anytime he "is removed from a secured area."  ECF No. 111-1 at 268.

23   Defendants assert, without citation to any supporting evidence, that the term "secured

24   area" refers to the "secured unit" and does not include the inmate's cell or the showers (ECF No.

25   112 at 5), which plaintiff argues qualify as "secured areas" (ECF No. 111 at 4).  However, a

26   review of the policy for the ASU shows that it further specifies that unclothed body searches are

27   mandated when an inmate is transferred into or out of the ASU (ECF No. 111-1 at 253-54); "prior

28   to exiting the cell for yard" (id. at 255); and "prior to departure from the housing block and again

14

1     upon returning to the housing block" when visiting the law library (id. at 258-59).  It does not

2     specify unclothed searches when escorting an inmate to or from the shower.  Id. at 267.  This is in

3     contrast to the policy for the security housing unit (SHU), which states more than once that

4     unclothed searches are to take place "prior to exiting the cell" (id. at 360, 365) and that when a

5     cell move takes place "both inmates entering and exiting the cells will be fully searched,

6     including all property and unclothed body search" (id. at 359).  The differing levels of specificity

7     in the policies support defendants' definition of "secured area."  Had plaintiff been housed in the

8     SHU, defendants would have been subject to mandatory search policies, but plaintiff was housed

9     in the ASU.

10         Outside these unit specific policies, the regulations provide that "[a]n inmate is subject to

11     an inspection of his or her person, either clothed or unclothed, when there is a reasonable

12     suspicion to believe the inmate may have unauthorized or dangerous items concealed on his or

13     her person, or that he or she may have been involved in an altercation of any kind."  Cal. Code

14     Regs. tit. 15, § 3287(b) (2011).  There does not appear to be any disagreement that a search

15     should have been conducted if defendant Gam had reason to believe that Williams was in

16     possession of a weapon.  ECF No. 100-1 at 6-7, 11.  However, defendant Gam contends that he

17     had no reason to believe that Williams had a weapon.  Id.

18         Finally, given the additional allegations that Williams was threatening to kill plaintiff, the

19     violation of plaintiff's rights by defendants' Gam and Starnes was in housing plaintiff with an

20     inmate who was threatening him, not in failing to search that inmate before housing them

21     together.  "It is well-established that a governmental officer may be held liable for damages for

22     constitutional wrongs engendered by his failure to adequately supervise or train his subordinates."

23     Ting v. United States, 927 F.2d 1504, 1512 (9th Cir. 1991) (citing Bergquist v. County of

24     Cochise, 806 F.2d 1364, 1369-70 (9th Cir. 1986)).  However, "'only where the failure to train

25     amounts to deliberate indifference to the rights of persons with whom the [subordinates] come

26     into contact'" is there a basis for liability under § 1983.  Id. (quoting City of Canton v. Harris, 489

27     U.S. 378, 388 (1989)).

28         Based on the additional information provided by plaintiff, it does not appear that he can

1    state a claim against Virga for failing to train correctional staff on mandatory search policies,

2    because those mandatory policies did not apply to plaintiff's housing unit and the failure of Gams

3    and Starnes to search Williams is not what led to plaintiff's assault.  Plaintiff's identification of

4    the policies he believes were violated undermines his claim for failure to train because the

5    policies do not mandate body and property searches when a cell move takes place.  Plaintiff will

6    therefore be required to show cause why his claims against defendant Virga for failure to train

7    should not be dismissed for failure to state a claim.

8                    ii.   Deficient Policy

9          In the "claim for relief" portion of plaintiff's complaint, it appears that he may have also

10   been attempting to make a claim for the implementation of an unconstitutional double-celling

11   policy.  ECF No. 1 at 8.  However, seemingly due to a typographical error, the complaint fails to

12   state a claim.  Plaintiff accuses Virga of "acts and/or omissions . . . in implementing, maintaining

13   and/or enforcing a policy and practice that restricts double-celling inmates that's [sic] been placed

14   in segregation for the reason of being deemed or alleged a dangerous security risk to others, for

15   depriving of safety and security constitutes Deliberate Indifferences in violation of 8th

16   Amendment of the U.S. Constitution."  Id.  Plaintiff's allegation that Virga was responsible for a

17   policy that restricted the double-celling of dangerous inmates fails to state a claim for violation of

18   his Eighth Amendment rights.

19         Presumably, plaintiff intended to allege that Virga had implemented a policy that does *not*

20   restrict the double-celling of inmates who have been deemed a security risk to others.  Otherwise

21   the claim makes little sense.  However, in defending his claims against defendant Nielson,

22   plaintiff asserts that there are policies in place restricting the double-celling of inmates who are a

23   danger to others, and that those policies should have specifically prevented him and Williams

24   from being housed together.  ECF No. 111 at 11-19.  In order for a supervisor to be liable for

25   implementing a deficient policy, the "policy [must be] so deficient that the policy itself is a

26   repudiation of the constitutional rights and is the moving force of the constitutional violation."

27   Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991) (citations and internal

28   quotations marks omitted), abrogated on other grounds by Farmer v. Brennan, 511 U.S. 825

1   (1970).  In light of plaintiff's additional allegations that policies existed, but Nielson failed to

2   adhere to them, it appears that plaintiff is unable to state a claim against Virga for a deficient

3   double-celling policy.  Accordingly, he will be ordered to show cause why amendment would not

4   be futile.

5                     iii.   New Claim

6        In his opposition to defendants' motion for summary judgment, plaintiff argues for the

7   first time that defendant Virga participated in plaintiff's classification hearing and acknowledged

8   at the hearing that "plaintiff was of the same gang that inmate[s] Williams and Arnold have been

9   attacking."[10]  ECF No. 111 at 6, 35.  He argues that based upon this interaction, Virga should

10  have ordered staff to keep members of those gangs separated.  Id.

11       The court, in its discretion, may consider plaintiff's additional claims as a motion to

12  amend under Federal Rule of Civil Procedure 15(a) and "[a]mendments for the purpose of adding

13  new claims are clearly permitted by Rule 15 and may be introduced and considered during the

14  pendency of a motion for summary judgment."  William Inglis & Sons Baking Co. v. ITT Cont'l

15  Baking Co., 668 F.2d 1014, 1053-54 & n.68 (9th Cir. 1981) (holding district court's consideration

16  of new claim in opposition to motion for summary judgment was proper where preparation of a

17  defense of the claims contained within the complaint "necessarily included a factual and legal

18  investigation covering the same area" as the new claim).  However, where the information

19  necessary to defend against the new claim would not be necessary to defend against the claim in

20  the complaint, "adding a new theory of liability at the summary judgment stage would prejudice

21  the defendant who faces different burdens and defenses under this second theory of liability."

22  Coleman v. Quaker Oats Co., 232 F.3d 1271, 1292 (9th Cir. 2000).  Here, the information

23  necessary to defend against plaintiff's new claims regarding defendant Virga's participation in the

24  classification hearing would not be necessary to defend against the policy and failure to train

25  _____

26  [10]  Although plaintiff seems to indicate multiple attacks, he identifies only a single attack by
    Williams and does not provide any additional allegations regarding other attacks on inmates that
27  were part of his gang by inmates that were part of the same gang as Williams.  ECF No. 111-1 at
    3, ¶¶ 8-9.

28

1   claims.  Nor would that information have necessarily been part of the investigation conducted in

2   defending against the claims against the other defendants.  The court therefore finds that

3   defendant Virga would be prejudiced by allowing plaintiff to proceed on this second theory of

4   liability at this late stage.

5        Because Federal Rule of Civil Procedure 15(a)(2) requires leave to amend be freely given

6   "when justice so requires," the finding of prejudice does not necessarily preclude denying leave to

7   amend.  However, the court also finds that plaintiff's new allegation -- that Williams' assault of a

8   single inmate who was in the same gang as plaintiff necessitated an order to keep the two gangs

9   separate -- fails to state a claim for deliberate indifference.  Even if defendant Virga

10  acknowledged that the prior assault was gang-related as plaintiff alleges (ECF No. 111-1 at 3, ¶

11  9), this does not necessarily demonstrate an overall need to keep all members of the two gangs

12  separated.  Nor does it demonstrate a specific threat to plaintiff.  This is especially the case in

13  light of plaintiff's assertion that the other inmate was assaulted by Williams not because of a gang

14  rivalry, but because that inmate was in the same gang as plaintiff and failed to talk to plaintiff to

15  arrange for Williams to assault plaintiff's cellmate.  Id. at ¶ 8.  In other words, plaintiff's fellow

16  gang member was assaulted because he was supposed to do something for Williams and did not.

17  His gang affiliation was relevant to why he was asked to talk to plaintiff, but not to the reason he

18  was assaulted.  There is no allegation that Virga was aware that the assault of plaintiff's fellow

19  gang member had any connection to plaintiff beyond the fact that they happened to be in the same

20  gang.  Plaintiff alleges that he was assaulted by Williams because he did not give Williams an

21  opportunity to assault his cellmate, not because they were in rival gangs.  ECF No. 111-1 at 2-3,

22  ¶¶ 7-8.

23       For these reasons, the court declines to consider plaintiff's new allegations or grant him

24  leave to amend.

25            3.  Defendants Gam and Starnes

26       In the complaint, plaintiff alleges that defendants Gam and Starnes failed to (1) conduct

27  body searches of plaintiff and Williams, (2) search their personal property, or (3) search

28  plaintiff's cell prior to housing the two together.  ECF No. 1 at 4.  He further alleges that after

18

1    Williams was placed in the cell and had his handcuffs removed, he began stabbing plaintiff and

2    defendants then proceeded to use their chemical spray on plaintiff rather than Williams and then

3    took no further action.  Id.

4            Defendants argue that they were not deliberately indifferent to plaintiff's safety because

5    they were not aware that Williams posed a threat to plaintiff.  ECF No. 100-1 at 10-12.  Gam

6    asserts that he did not regularly work as a floor officer where plaintiff was housed and so was

7    unfamiliar with Williams and plaintiff.  Id. at 10-11.  He further argues that when he escorted

8    Williams to plaintiff's cell, he conducted a visual search of Williams, who was wearing boxers

9    and an undershirt, and had no reason to believe he had a weapon on him.  Id. at 11; ECF No. 113

10   at 4, ¶ 15.  He also states that the use of pepper spray is recommended by policy when it is

11   necessary to use force on inmates who are in their cells.  ECF No. 100-1 at 11.  Starnes claims

12   that although he was a regular floor officer in the building, he was not aware of any incidents

13   between the two that would indicate Williams was a danger to plaintiff.  Id. at 12.  He also argues

14   that when plaintiff and Williams signed the compatibility chrono, neither objected to being

15   housed together or raised any security concerns.  Id.  He also asserts that his use of pepper spray

16   was in accordance with policy.  Id.

17           In opposing the motion for summary judgment, plaintiff provides a declaration in which

18   he states that both Starnes and Gam came to advise him that he would be housed with inmate

19   Williams.  ECF No. 111-1 at 3, ¶ 10.  He alleges that he told them "I don't want to cellup with

20   inmate Williams, as you already know we don't get alone [sic].  Why are you trying to cell me up

21   with somebody you know always talking about how he is going to kill me?"  Id.  He claims

22   Starnes proceeded to threaten him with a rules violation, and that he signed the chrono because he

23   did not want another violation since it would increase his release date and require him to serve a

24   term in the SHU.  Id. at 4, ¶ 11; ECF No. 111.  Plaintiff also submits a declaration from inmate

25   Potts, who declares under penalty of perjury that he witnessed inmate Williams threaten plaintiff

26   in front of defendant Starnes[11] and that he later witnessed Starnes tell Williams that he would

27   _____

28   [11]  Defendants object to paragraphs 2 and 3 of inmate Potts' declaration as containing
     (continued…)

1    have a chance to "give [plaintiff] his discipline."  ECF No. 111-1 at 10-11.

2           Plaintiff's claim that defendants Gam and Starnes failed to conduct mandatory searches

3    prior to housing him with Williams does not establish that defendants were deliberately

4    indifferent to his safety because the policies do not actually mandate searches in the ASU

5    whenever a cell change occurs.  Moreover, even if the policies did dictate searches in the manner

6    plaintiff alleges, the failure to follow policy does not constitute a per se constitutional violation,

7    though it can support an inference of deliberate indifference.  However, the allegations that Gam

8    and Starnes were aware that Williams was threatening plaintiff, and that Starnes promised

9    Williams a chance to "give [plaintiff] his discipline," directly contradict Gam's and Starnes'

10   statements that they were unaware that Williams was a threat to plaintiff's safety.

11          Starnes claim that he was not threatening plaintiff when he told him he would receive a

12   rules violation for refusing Williams as a cellmate (ECF No. 112 at 6) also creates a factual

13   dispute.  Although Starnes cites policy which states "inmates shall be . . . subject to disciplinary

14   action and consideration for placement in more restrictive housing for refusing a double-cell

15   housing assignment" (id. quoting ECF No. 111-1 at 245 [DOM § 54046.1]), other evidence on the

16   record, taken in the light most favorable to plaintiff, could support the claim that Starnes

17   threatened him.  Defendants set forth in their statement of facts that "[t]he compatibility chrono

18   provides inmates with the opportunity to refuse a cellmate or to provide officers with information

19   as to why they do not believe they can safely house with the new cellmate."  DSUF ¶ 8 (emphasis

20   added).  The use of the disjunctive "or" and the identification of safety issues as a separate option,

21   indicates that raising safety concerns is not the same as refusing a cellmate or double-cell housing

22   assignment.  This more nuanced interpretation of the policy is further supported by defendant

23   Nielson's verified interrogatory response, which states that "[i]nmates do not receive Rules

24   Violation Reports for refusing to sign a compatibility chrono (CDCR form 1802-B).  But if they

25   are housed in a double cell without a cellmate and they continuously refuse to accept any

26   _____

27   inadmissible hearsay.  ECF No. 114.  This objection is overruled to the extent the statements are
     used to prove that Starnes was aware of threats being made against plaintiff rather than to the
     veracity of the threats themselves.

28

cellmate, it is possible that they will receive Rules Violation Report." ECF No. 111-1 at 94 (emphasis added). In light of these additional facts, a jury could find that plaintiff tried to advise Gam and Starnes that he had a safety issue with Williams and that Starnes improperly threatened to write him up for refusing the housing assignment in order to coerce plaintiff into signing the form. Since plaintiff alleges that both Gam and Starnes were present when this happened, there is a factual dispute as to whether either defendant could rely on the signed compatibility chrono as evidence that Williams was not a safety risk to plaintiff.

There are also factual disputes surrounding plaintiff's claim that defendants Gam and Starnes sprayed him with pepper spray and delayed in stopping the assault. Plaintiff claims that "[n]ot one time did any officer order Williams to stop nor get down. They just allowed Williams to attack me for at least some minutes, then they started spraying me. Gam and Starnes did not spray Williams not one time." ECF No. 111-1 at 5, ¶ 19. He also claims that Williams continued his assault for "awhile" after both officers discharged their pepper spray. Id., ¶ 20. This contradicts defendants' account of the events. Defendants claim that Gam first ordered plaintiff and Williams to stop fighting and when they ceased to comply he discharged his pepper spray through the cell's food port. DSUF ¶ 21. They further assert that when Starnes arrived he ordered plaintiff and Williams to get down and when they ignored his commands he also discharged his pepper spray through the food port and the fight stopped shortly thereafter. DSUF ¶¶ 22-24. Although defendants cite to policy that states pepper spray is the preferred option for use of force when inmates are in their cells, they do not provide a copy of the policy which was in effect at the time of the incident. DSUF ¶ 21. The copy of the DOM available on the CDCR's website contains the use of force policy as revised on January 12, 2016.[12] Yet, even if the policy at the time did identify pepper spray as the preferred option for the situation, in light of plaintiff's allegations that defendants did not act immediately, that they only sprayed plaintiff, and that defendant Starnes helped to arrange the assault, a jury could find that the use of pepper spray was

---

[12] See http://www.cdcr.ca.gov/Regulations/Adult_Operations/docs/DOM/DOM%202016/2016_DOM.PDF at 328, 331.

1   intended to further incapacitate plaintiff during the assault by Williams rather than to bring the

2   assault to a stop.

3          The disputes caused by the competing declarations cannot be resolved without credibility

4   determinations, which are the function of the jury, not of a judge on a motion for summary

5   judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Both parties' versions of

6   events are supported by declarations signed under penalty of perjury, and the contents of the

7   declarations are such that the declarants would have personal knowledge of them. These

8   declarations are therefore sufficient to create material factual disputes as to whether defendants

9   Gam and Starnes were aware that Williams presented a risk to plaintiff's safety, and whether they

10  took proper steps to intervene once the assault began. Accordingly, summary judgment must be

11  denied.

12             4.   Qualified Immunity

13         "Government officials enjoy qualified immunity from civil damages unless their conduct

14  violates 'clearly established statutory or constitutional rights of which a reasonable person would

15  have known.'" Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting Harlow v.

16  Fitzgerald, 457 U.S. 800, 818 (1982)). In analyzing a qualified immunity defense, the court must

17  consider the following: (1) whether the alleged facts, taken in the light most favorable to the

18  plaintiff, demonstrate that defendant's conduct violated a statutory or constitutional right; and (2)

19  whether the right at issue was clearly established at the time of the incident. Saucier v. Katz, 533

20  U.S. 194, 201 (2001), overruled in part by Pearson v. Callahan, 555 U.S. 223, 236 (2009)

21  (overruling Saucier's requirement that the two prongs be decided sequentially). The Supreme

22  Court has "'repeatedly told courts . . . not to define clearly established law at a high level of

23  generality.'" Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quoting Ashcroft v. al-Kidd, 563

24  U.S. 731, 742 (2011)). "The dispositive question is 'whether the violative nature of *particular*

25  conduct is clearly established.'" Id. (emphasis in original). "[T]his inquiry 'must be undertaken

26  in light of the specific context of the case, not as a broad general proposition.'" Brosseau v.

27  Haugen, 543 U.S. 194, 198 (2004) (quoting Saucier, 533 U.S. at 201).

28         These questions may be addressed in the order most appropriate to "the circumstances in

22

1    the particular case at hand." Pearson, 555 U.S. at 236.  Thus, if a court decides that plaintiff's

2    allegations do not support a statutory or constitutional violation, "there is no necessity for further

3    inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.  On the other hand, if a court

4    determines that the right at issue was not clearly established at the time of the defendant's alleged

5    misconduct, the court need not determine whether plaintiff's allegations support a statutory or

6    constitutional violation.  Pearson, 555 U.S. at 236-242.

7                    a.   Defendant Nielson

8          Defendant Nielson alternatively argues that he is entitled to qualified immunity because

9    he followed prison procedure and reviewed both inmates' central files before approving plaintiff

10   and Williams to double cell.  ECF No. 100-1 at 14.  However, as addressed above in Section

11   VII.A., it is not clear that Nielson complied with policy by reviewing the central files.  However,

12   the court finds that despite any failure to comply with prison policy, defendant Nielson would

13   alternatively be entitled to qualified immunity.

14         In Estate of Ford, the Ninth Circuit found that while "Farmer clearly states the general

15   rule that prison officials cannot deliberately disregard a substantial risk of serious harm to an

16   inmate; . . . it is [also] relevant that neither Farmer nor subsequent authorities has fleshed out 'at

17   what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment

18   purposes.'"  301 F.3d at 1050-51 (quoting Farmer, 511 U.S. at 834 n.3).  The Ninth Circuit

19   further held that it was clearly established that if an officer knew that an inmate "was acting out

20   dangerously with cellmates or that he was a threat to [a specific inmate] but housed [that inmate]

21   with him anyway, this would violate the Eighth Amendment." Id. at 1050.  However, the court

22   went on to state that "it would not be clear to a reasonable prison official when the risk of harm

23   from double-celling . . . inmates with one another changes from being a risk of some harm to a

24   substantial risk of serious harm." Id. at 1051 (emphasis in original).  The Ninth Circuit then went

25   on to find the defendants were entitled to qualified immunity because while allowing the inmate

26   who attacked and killed the plaintiff "to be double-celled with [the plaintiff] turned out be quite

27   unfortunate judgments, [the court could not] say that a reasonable correctional officer would have

28   ////

1   clearly understood that the risk of serious harm was so high that he should not have authorized the

2   double-celling." Id. at 1051.

3       One of the defendants in Estate of Ford was the lieutenant responsible for approving the

4   cell assignment, just as Nielson was here.  In that case, as in this one, the lieutenant did not

5   review the inmates' central files and both inmates had signed a form stating they agreed to the

6   assignment. Id. at 1047, 1052.  It was further alleged that the lieutenant did not look at any

7   documentation and instead relied upon the representation of another officer who stated that he

8   knew both inmates, "approved of the request by [the inmates] to be celled together and that he

9   believed [they] were not enemies, did not have a gang-related conflict, and were not a 'predator'

10  and 'victim' combination." Id. at 1052.  The lieutenant was aware that the assailant had attacked

11  another inmate on the yard the previous month, but also knew that the plaintiff had previously

12  been housed with the assailant without incident.  Id. at 1047, 1052.  The Ninth Circuit found that

13  based on this information, the lieutenant "had little reason to think that the [assailant] was

14  excessively dangerous or that he posed any particular danger to [the plaintiff]." Id. at 1052.  The

15  court further found that even if the lieutenant had reviewed the assailant inmate's central file and

16  discovered his "extensive history of violent behavior and [that he] was being transferred to a

17  higher security prison" this would not have made the lieutenant aware of a substantial risk of

18  serious harm because the records also showed only one incident of aggression toward a cellmate

19  (approximately three weeks prior to being housed with the plaintiff), and that at that time he was

20  off his medications and had since been put back on them.  Id.

21      In this case, Nielson reviewed, at a minimum, plaintiff's and Williams' administrative

22  segregation files which indicated their gang affiliations and known enemies.  ECF No. 104 at ¶¶

23  2, 5.  There is no evidence that either plaintiff's or Williams' files contained information

24  demonstrating that Williams posed a specific threat to plaintiff,[13] that the mere fact that they were

25  in different gangs made them incompatible cellmates, or that Williams had a history of violence

26

27  ───────────────
    [13]  The enemy list submitted by plaintiff shows that Williams was added as an enemy after the
    incident at issue in this case.  ECF No. 111-1 at 389.

28

towards cellmates.  Additionally, there is no evidence that defendant Nielson was aware of the alleged threats by Williams against plaintiff or that Nielson had reason to think that plaintiff had unwillingly signed the compatibility chrono.  On these facts, it would not have been clear to a reasonable lieutenant, even one that had reviewed both inmates' entire central files, that housing Williams and plaintiff together would pose a substantial risk of serious harm to plaintiff.  Defendant Nielson is therefore alternatively entitled to qualified immunity.

b. Defendants Gam and Starnes

"[S]ummary judgment based on qualified immunity is improper if, under the plaintiff's version of the facts, and in light of the clearly established law, a reasonable officer could not have believed his conduct was lawful."  Schwenk v. Hartford, 204 F.3d 1187, 1196 (9th Cir. 2000) (citing Grossman v. City of Portland, 33 F.3d 1200, 1208 (9th Cir. 1994)).  At the time of the incident, it was clearly established that if an officer *knew* that an inmate "was acting out dangerously with cellmates or that he was a threat to [a specific inmate] but housed [that inmate] with him anyway, this would violate the Eighth Amendment."  Estate of Ford, 301 F.3d at 1050.  Under plaintiff's version of the facts, defendants Gam and Starnes were aware that Williams was threatening to kill plaintiff and therefore knew that he was a threat to plaintiff, but housed them together anyway.  The factual disputes involving Gam's and Starnes's knowledge that Williams was threatening plaintiff preclude finding that they are entitled to qualified immunity, because a reasonable officer would not have believed that it was lawful to double-cell plaintiff with an inmate who was threatening him.

G. Summary

The motion for summary judgment should be granted as to defendant Nielson and as to the request for injunctive relief against defendant Virga.  The motion should be denied as to defendants Gam and Starnes and the claims against Virga for damages.

As to defendant Nielson, the motion should be granted because plaintiff has not shown that Nielson was aware of a significant risk to plaintiff's safety.  Because Nielson saw the signed compatibility chrono and had no reason to think plaintiff had been forced to sign the form, his failure to review the complete central files was no more than negligent.  Alternatively, the motion

25

1   should be granted because Nielson is entitled to qualified immunity because it was not clear that

2   the decision to house plaintiff and Williams together put plaintiff at substantial risk of serious

3   harm.

4           The request for defendant Virga to make policy changes is moot because plaintiff is no

5   longer in CDCR custody.  Therefore Virga is entitled to summary judgment on the claim for

6   injunctive relief.  The motion should be denied as to Virga on all other grounds because Virga did

7   not ask for summary judgment on the claim that plaintiff actually made against him.  However,

8   plaintiff must show cause why his claims against Virga should not be dismissed for failure to

9   state a claim.  Plaintiff has added additional information about the policies involved.  The

10  additional information shows that the policies do not require mandatory searches for a cell move,

11  and that the policies do have provisions to prevent dangerous inmates from being housed with

12  other inmates.  Additionally, it appears that the alleged violation of plaintiff's rights was due to

13  defendants Gam and Starnes housing Williams with plaintiff even though he was threatening

14  plaintiff, not because they failed to search Williams.  In order to show cause, plaintiff must

15  explain how the failure to train defendants Gam and Starnes on search procedures caused

16  plaintiff's injury when the policies did not mandate Williams be searched.  Plaintiff must also

17  explain how the double-cell policies were deficient and caused his injury when it appears that he

18  is now claiming that there were policies in place but defendant Nielson did not follow them.

19          The motion should be denied as to defendants Gam and Starnes because there are material

20  factual disputes regarding whether they knew Williams was threatening plaintiff and whether they

21  properly acted to stop the assault.

22                                          CONCLUSION

23          IT IS HEREBY ORDERED that within thirty days of service of this order, plaintiff shall

24  show cause why his claims for failure to train and implementation of a deficient policy against

25  defendant Virga should not be dismissed for failure to state a claim.

26          IT IS FURTHER RECOMMENDED that defendants' motion for summary judgment

27  (ECF No. 100) be granted in part and denied in part as follows:

28                  a.  Granted as to defendant Nielson;

26

1            b.  Granted as to the request for injunctive relief against defendant Virga and

2 denied in all other respects as to Virga;

3            c.  Denied as to defendants Gam and Starnes.

4        These findings and recommendations are submitted to the United States District Judge

5 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

6 after being served with these findings and recommendations, any party may file written

7 objections with the court and serve a copy on all parties.  Such a document should be captioned

8 "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

9 objections shall be served and filed within fourteen days after service of the objections.  The

10 parties are advised that failure to file objections within the specified time may waive the right to

11 appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

12 DATED: September 28, 2016

13

14 ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28